# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 15 2019, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark J. Wiley
Bowers, Brewer, Garrett & Wiley, LLP
Huntington, Indiana

ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of: E.C. (Minor Child) <br><br> and <br><br> A.C. (Mother), <br><br> *Appellant-Respondent,* <br><br> *v.* <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | January 15, 2019 <br><br> Court of Appeals Case No. 18A-JT-2166 <br><br> Appeal from the Huntington Circuit Court <br><br> The Hon. Jamie M. Groves, Judge <br><br> Trial Court Cause No. 35C01-1712-JT-17 |

**Bradford, Judge.**

# Case Summary

[1] On July 2, 2016, A.C. ("Child") was born to E.C. ("Mother") and A.V. ("Father"[1]) and tested positive for THC and methamphetamines. The Indiana Department of Child Services ("DCS") at first offered Mother an informal adjustment, but Child was removed from her care after Mother failed a number of drug screens. In August of 2016, Child was adjudicated to be a child in need of services ("CHINS"). Over the course of approximately the next two years, Mother failed numerous drug screens and avoided several more, failed to complete any court-ordered reunification services, visited with Child only twice, and was in and out of jail. Mother is currently incarcerated in Ohio. Meanwhile, Child has been in the same foster placement since July of 2016 and has thrived. In December of 2017, DCS petitioned to terminate Mother's parental rights in Child, and the juvenile court ordered Mother's rights terminated in August of 2018. Mother contends that the juvenile court's judgment is clearly erroneous. Because we disagree, we affirm.

# Facts and Procedural History

[2] On March 7, 2016, Mother was convicted of Class B misdemeanor marijuana possession and was sentenced to sixty days of incarceration to be followed by

---

[1] Father's paternity of Child was established on or about July 14, 2017, and he filed his consent to the adoption of Child on March 8, 2018, which the juvenile court accepted. Because Father does not participate in this appeal, we shall convey the facts only as they relate to Mother.

probation. When Child was born to Mother on July 2, 2016, Child tested positive for THC and amphetamines. On July 4, 2016, DCS Family Case Manager Rebecca Rankin ("FCM Rankin") learned that Child had tested positive for illegal drugs and investigated. Mother admitted to FCM Rankin that she had smoked marijuana two days prior to Child's birth but denied any amphetamine use. Mother also told FCM Rankin that she had ended her relationship with Father due to some "possible domestic violence that had been going on between the two of them." Tr. Vol. III pp. 50–51. Child was allowed to leave with Mother, and they went to stay with a friend of Mother's.

[3]     FCM Rankin eventually became aware that Mother was on probation at the time of Child's birth and that she had "deep-rooted" and "serious substance abuse issues that, that most likely stemmed from trauma and grief." Tr. Vol. III p. 53. Initially, Mother was offered substance-abuse treatment, individual counseling, random drug screens, and a medication evaluation as part of an informal adjustment. Mother failed three drug screens in the next few weeks (testing positive for methamphetamine, amphetamine, and THC), and, on July 25, 2016, when Mother was incarcerated for violating the terms of her probation, DCS took custody of Child. On July 27, 2016, a detention hearing was conducted, after which Child was placed in foster care and DCS petitioned to have her declared a CHINS. The same day, Mother failed another drug screen and, over the next few weeks, broke several substance-abuse treatment appointments. On August 25, 2016, the juvenile court adjudicated Child to be a CHINS and issued a dispositional order, requiring Mother to (1) maintain

good communication with FCM Rankin; (2) maintain safe and stable housing and stable income; (3) not use illegal substances or alcohol; (4) obey the law; and (5) comply with a number of other services, including substance-abuse assessment and treatment, drug screens, meeting all of Mother's and Child's health needs, and participation in visitation as ordered.

[4] Mother tested positive for methamphetamine and amphetamine once in September of 2016, three times in October, once in November, once in December, and once in January of 2017. Mother also tested positive for THC in October of 2016. Following a review hearing on January 6, 2017, the juvenile court found that Mother was only partially in compliance with the case plan because she had failed to stay drug-free, had not regularly participated in services, had not enhanced her ability to fulfill her parental obligations, and had only recently had her one and only visitation with Child.

[5] Mother tested positive for methamphetamine and/or amphetamine three more times in January of 2017, twice in February, once in April, once in May, and twice in June. Mother also tested positive for cocaine on June 30, 2017. The juvenile court held a permanency review hearing on August 2, 2017, after which it approved adoption as Child's permanency plan and authorized DCS to petition to terminate Mother's parental rights. The juvenile court found that Mother had failed several drug screens and had failed to submit to nineteen others, had failed to consistently participate in any of her court-ordered services, and had not regularly visited with Child.

[6]     On December 7, 2017, DCS petitioned to terminate Mother's parental rights in Child. On January 18, 2018, the juvenile court held a case-review hearing, after which it found that

> c. Mother has not complied with the Child's case plan. Mother is scheduled to drug screen at the DCS office on Mondays, Wednesdays and Fridays unless otherwise exempted by the FCM. For the months of June and July, Mother was inconsistent in completing those drug screens. On June 1, 2017[,] Mother tested positive for methamphetamine and on June 30, 2017, Mother tested positive for cocaine. Mother entered the Worth Center in Ohio under court order out of a criminal case in Shelby County, Ohio in September 2017 and was released at the end of November 2017. Mother did not make contact with DCS until January 5, 2018. On January 12, 2018, Mother drug screened and tested positive for methamphetamine and amphetamine. Mother did schedule appointments with the Bowen Center to begin Court-ordered services but did not attend the appointments. Mother has begun to participate in services after contacting DCS on January 5, 2018.
> d. Mother has not visited with the child since February 8, 2017. Mother has indicated that she wishes to begin visits and DCS requests that any visits be therapeutic.
> e. Mother has not cooperated with DCS in that Mother has not maintained contact with DCS or service providers.
> […]
> h. The cause of the Child's out of home placement or supervision has not been alleviated. Mother has not built a relationship with the child. Mother has been in and out of jail on drug related charges. Mother has not adequately addressed the substance abuse issues that led to the removal of the child.

Appellant's App. Vol. II p. 14.

[7] The juvenile court held a permanency hearing on August 2, 2018, during which the juvenile court heard evidence regarding Mother's non-compliance with ordered services and legal troubles. As for noncompliance with ordered services, after Mother completed a substance assessment on October 17, 2016, it was recommended that she participate in individual therapy for substance-abuse treatment, parenting skills training, and mental-health counseling and continue with DCS recommendations. Mother's attendance in therapy was "very poor[,]" Tr. Vol. III p. 117, participating in four sessions from December 2, 2016, to January 16, 2017, three sessions from June 16 until July 19, 2017, and one session on January 19, 2018. Mother did not successfully complete any of her treatment goals. Mother was also referred to work with a life skills coach but did not participate. Mother admitted at the termination hearing that she had not completed any of DCS's referred treatment programs.

[8] Regarding visitation with Child, Mother, after her release from jail in 2016, failed to contact FCM Rankin to start visits with Child. Mother's first visit with Child was in January of 2017 and her second (and last) was in February; Mother has not visited Child since. Visits went well the two times Mother did visit, but she was "just was not consistent at all." Tr. Vol. III p. 67. Mother understood that in order to visit Child she had to pass her drug screens and attend counseling, which she did not do. Although Mother sometimes had consecutive clean drug screens, there were times when FCM Rankin could not locate Mother. Mother admitted that she did not get to visit "because [she] messed up and [she] started using." Tr. Vol. III p. 38.

[9] As for Mother's recent legal troubles, Mother was convicted in 2015 in Ohio of improper handling of a firearm in a motor vehicle, a 4th degree felony. In May of 2017, the Ohio court ordered that Mother serve five years on probation. On June 5, 2017, Mother tested positive for, and admitted to using, methamphetamine, resulting in the Ohio court ordering Mother to complete treatment at the Worth Center in Lima, Ohio. Mother started the program on August 3, 2017, and completed it on November 28, 2017. Mother admitted that this was "probably the best stretch in the last couple of years for [her]." Tr. Vol. III p. 28. Mother, however, also testified that after she completed the program, "[she] came home and it started all over." Tr. Vol. III p. 28. Mother tested positive for methamphetamine on December 13, 2017.

[10] By the time of the termination hearing, Mother was incarcerated at the Ohio Woman's Reformatory prison. Mother had violated the terms of her probation by testing positive for methamphetamine in December of 2017 and failing to report to the probation department on January 22, 2018. Mother had also tested positive on April 30, 2018, for methamphetamine and amphetamine. On May 16, 2018, the Ohio court sentenced Mother to serve eighteen months in prison, and her release date is May 26, 2019. Although Mother has filed to have her sentence modified by a judicial release (which the Ohio criminal court has taken under advisement), she would still have to live in a half-way house and would remain on probation for another five years even if the release were granted.

[11] Meanwhile, in June of 2017, Indiana charged Mother with Class C misdemeanor operating a vehicle without financial responsibility. In or around February of 2018, Indiana charged Mother with three driving infractions. On February 21, 2018, Mother was charged with Class C misdemeanor resisting law enforcement. On February 26, 2018, Mother pled guilty to her outstanding charges and was sentenced on the traffic charges to sixty days, all suspended to time served, with 353 days on informal probation, and, for the resisting charge, 365 days in jail with 345 days suspended to informal probation to be served consecutive to the traffic sentences.

[12] FCM Raegan Graft, who took over the case from FCM Rankin in August of 2017, testified that Mother "would appear for a while and then she'd disappear for a while. Um, she was in and out of jail constantly. Um, she would show up to services, but then no-show services, and it was just a constant cycle for her." Tr. Vol. III p. 130. FCM Graft did not recommend returning Child to Mother's care because Mother "hasn't been able to show that she can provide herself with a stable and clean living environment, and, therefore, she wouldn't be able to provide that for [Child] at this moment, either." Tr. Vol. III p. 139. FCM Graft testified that termination was in Child's best interests because Child had been out of Mother's care for two years, Child only knows the foster family where she has been placed for two years as her family, and Mother "is a stranger" to Child. Tr. Vol. III p. 140.

[13] Guardian *ad Litem* Kathryn Garrett ("GAL Garrett") opined that termination was in Child's best interests because Mother had not

been able to rectify the situation that necessitated the removal. Um, there's been an inconsistent, um, ability to stay out of jail, to provide a stable home and living environment for [Child]. Um, and beyond that, uh, because [Mother] hasn't made progress in those areas, I don't think that because she wouldn't be able to provide a home soon, I think that [Child] deserves permanency. She's been in her current foster placement for 2 years. Um, she's very, very bonded with her foster family, um, and I believe that that's appropriate.

Tr. Vol. III pp. 147–48. GAL Garrett opined that termination and adoption by foster parents was in Child's best interests.

[14] Child's foster mother Denise Jones testified that Child had been placed with her, her husband, and their four children when Child was twenty-one days old. Jones testified that Child was a "happy[,] bubbly, smiley, rotten little 2-year old." Tr. Vol. III p. 125. According to FCM Rankin, Child exhibited slight signs of drug withdrawal at first and failed to meet some milestones. It was eventually determined that Child had difficulty hearing, an issue that was solved when tubes were put into her ears in mid-2017. At that point, Child's "vocabulary took off from there and she's been a chatty [C]athy ever since." Tr. Vol. III p. 65. On August 29, 2018, the juvenile court ordered the termination of Mother's parental rights in Child.

# Discussion and Decision

[15] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further,

we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the children's interest in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[16] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[17] Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights. Of relevance to this case, DCS was required to establish, by clear and convincing evidence,

> (A) that […] the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> > [….]
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.
> > […]
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[18] Mother concedes that Child was removed for at least six months pursuant to a dispositional decree and that DCS has a satisfactory plan for the care and treatment of Child. Mother contends, however, that DCS failed to establish that (1) there is a reasonable probability that the conditions that resulted in Child's removal would not be remedied, (2) the continuation of the parent–child relationship poses a threat to the well-being of Child, (3) or termination is in the best interests of Child.

# I. Indiana Code Section 31-35-2-4(b)(2)(B)

[19] Mother contends that the record does not establish that the reasons for Child's continued removal would not be remedied or that the continued parent–child relationship posed a threat to Child. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS need only establish one of these circumstances. *See* Ind. Code § 31-35-2-4(b)(2)(B) (providing that DCS must establish that one of the following is true: "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied[, t]here is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child[, or t]he child has, on two (2) separate occasions, been adjudicated a child in need of services").

[20] We choose to first address Mother's contention that DCS has failed to establish a reasonable probability that the reasons for Child's continued removal would not be remedied. In making such a determination, a juvenile court engages in a two-step inquiry. First, the juvenile court must "ascertain what conditions led to their placement and retention in foster care." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying these initial conditions, the juvenile court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the home will not be remedied." *In re D.D.*, 804 N.E.2d 258, 266 (Ind. Ct. App. 2004) (citation omitted). The statute focuses not only on the initial reasons for removal "but also those bases resulting in continued placement outside the

home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. DCS need not rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.*, 879 N.E.2d 7, 18–19 (Ind. Ct. App. 2008), *trans. denied*.

[21] Here, Child was removed because of Mother's substance abuse: Child was born with THC and methamphetamine in her system and was removed from Mother's care three weeks later when Mother was incarcerated for violating the terms of her probation by using illegal drugs. As for whether the conditions are likely to be remedied, Mother has had over two years to address her substance-abuse issues, and, despite ready access to the resources needed to do so, has not done so. Over the course of DCS's involvement in Child's life, Mother has failed at least twenty-four drug screens, testing positive for methamphetamine, amphetamine, cocaine, and/or THC. Mother has also failed to submit to at least nineteen drug screens. After a four-month stint at a treatment facility in Ohio in 2017, Mother tested positive for methamphetamine again within three weeks of release. Mother last tested positive for methamphetamine on April 30, 2018, and her Ohio probation was revoked approximately two weeks later. Even with her freedom and parental rights in Child at stake, Mother has been unable to stay clean. Given Mother's consistent history of drug use, the record contains ample evidence to support a finding that there is a reasonable

probability that the conditions that led to Child's removal would not be remedied.[2]

## II. Indiana Code Section 34-35-2-4(b)(2)(C)

[22] Mother contends that insufficient evidence supports the juvenile court's conclusion that termination is in Child's best interests. We are mindful that in determining what is in the best interests of Child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id*. Furthermore, this court has previously determined that the testimony of a GAL regarding a child's need for permanency supports a finding that termination is in the child's best interests. *In the matter of Y.E.C.*, 534 N.E.2d 273, 276 (Ind. Ct. App. 1992). FCM Graft and GAL Garret both opined that termination and adoption by the Joneses was in Child's best interests. While this testimony is likely sufficient to support the juvenile court's conclusion to that effect, it is not as though these opinions are unsupported by the record. FCM Graft testified that Mother exhibited a pattern of sporadic compliance with services and was unable to stay out of trouble with the law or maintain stable and clean housing. FCM Graft also noted that Child had been out of Mother's care for two years, only knows

---

[2] We need not address Mother's claim that the record will not support a finding that there is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of Child.

the Joneses as her family, and does not have a relationship with Mother. GAL Garrett noted that Mother has not addressed her substance-abuse issues, been able to stay out of jail, or been able to provide Child with a stable environment.

[23] Moreover, the record indicates that Child is thriving in her pre-adoptive placement with the Joneses, a situation that, at this point, is difficult to imagine occurring under Mother's care. GAL Garrett testified that Child was "very, very bonded" with the Joneses. Child's foster mother Denise testified that Child was a happy and "bubbly" two-year old. FCM Rankin testified that Child, formerly withdrawn and missing developmental milestones, had received treatment for her hearing issues and was now a "chatty Cathy" who was meeting her milestones. The record supports the juvenile court's conclusion that termination is in Child's best interests.[3]

[24] The judgment of the juvenile court is affirmed.

Bailey, J., and Brown, J., concur.

---

[3] Mother argues that the juvenile court's sole basis for terminating her parental rights was her incarceration. While it is true that the Indiana Supreme Court has held that "incarceration is an insufficient basis for terminating parental rights[,]" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 643 (Ind. 2015), Mother's incarceration was by no means the sole—or even a significant—basis for the juvenile court's judgment in this case. The juvenile court's comprehensive fourteen-page order mentions Mother's periods of incarceration, of course, but a fair reading of the order is that the termination is based almost entirely on Mother's inability to achieve and maintain sobriety and her consistent failure to take advantage of the opportunities given to her. We conclude that *K.E.*'s holding has no applicability in this case.